IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

* * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 15-42-CVG-RM |
| v. | ) | |
| | ) | |
| WAYNE A.G. JAMES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**AMENDED MOTION FOR NEW TRIAL UNDER RULE 33, OR,
IN THE ALTERNATIVE, FOR RECONSIDERATION OF THE DEFENDANT'S
MOTION FOR MISTRIAL**

NOW COMES defendant Wayne James, through undersigned, Federal Public Defender Omodare Jupiter, to respectfully request a new trial pursuant to Fed. R. Crim. P. 33.  In the alternative, Mr. James asks this Court to reconsider his motion for a mistrial that was made after the first polling of the twelve jurors selected to sit in this case revealed a lack of unanimity, as well as a defect in the proceeding itself.  In summary, the Court violated Fed. R. Crim. P. 31(d) when it failed to grant a mistrial, replaced a juror with an alternate, and instructed the jurors to begin deliberations anew.  Further, Mr. James was deprived of his Fifth Amendment right to due process, and his Sixth Amendment right to a jury trial.  The only remedy available to the court after the first polling of the jury was to declare a mistrial.  The taint that occurred continued to invalidate any subsequent verdict.

## I.        Standard for Motions for Mistrial

In considering a motion for a new trial under Federal Rule of Criminal Procedure 33, the trial court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). On a Rule 33 motion, "[t]he court may weigh the evidence, but may set aside the verdict and grant a new trial only if it determines that the verdict constitutes a miscarriage of justice, or if it determine-s that an error at trial had a substantial influence on the verdict." United States v. Malik, Crim. No. 08-614, 2009 WL 4641706, at *3 (E.D. Pa. Dec. 7, 2009) quoting United States v. Enigwe, No. 92–00257, 1992 WL 382325, at *4 (E.D. Pa. Dec. 9, 1992) (citations omitted), aff'd, 26 F.3d 124 (3d Cir. 1994). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002).  As shown below, the trial process was infected with errors of structural and constitutional dimensions.  A new trial, with a newly constituted jury is the cure available.

## II.        Facts

Jury selection in this case began on the morning of Monday, August 13, 2018.  The court propounded routine *voir dire* questions to the jury, including questions about whether jurors heard anything in the press or from other sources about the case, whether they were related or knew the parties, attorneys, or witnesses, and whether anything they heard would prevent them from being fair and impartial.  After the conclusion of *voir dire*, twelve jurors were selected along with two alternates.  Among the jurors who were seated as the ultimate judges of the facts in this matter was Juror No. 103.  She was in seat number 8.  She did not answer a single question posed by the Court

during the *voir dire* process.  The Court would later learn that this juror had serious difficulty understanding and communicating in English.

The government began presenting its case-in-chief later that morning.  The government rested towards the end of the second day of trial which was Tuesday, August 14.  The defense rested soon thereafter, choosing not to put on any evidence.  After a brief charging conference, the parties offered closing arguments.  The Court then gave final instructions to the jury on the evening of August 14, 2018.  Rather than allow deliberations to begin that evening, the Court excused the jury for the night and instructed them to return the next morning.

Deliberations began on August 15, 2018 at 9:00 a.m.  At approximately 3:30 p.m. that same day, the parties were summoned to Court for the reading of the verdict.  The Court asked the foreperson to read the verdict form.  Tr. 19[1].  The foreperson announced a guilty verdict as to all three counts of the indictment.  Tr. 19 – 20.   Defense counsel then requested that the jury be polled.  Tr. 20.  The courtroom clerk then asked each juror to stand up and to state whether the verdict that was read by the foreperson was their independent verdict.   The clerk posed that question to each juror by calling out their seat number.  Tr. 20 – 21. Jurors in Seats one through seven all answered "Yes it is."  But when she reached Seat number eight, there was no answer. The clerk asked, "Seat 8, is this your independent verdict?"  There was no response.  Tr. 21.  The clerk asked again, "Seat 8, is this your independent verdict?" The silent juror then turned to the juror in the seat next to her and began mumbling something. The clerk attempted to move on to Seat 9, but the Court interrupted and told the clerk to repeat the question to the juror in Seat 8 for

---

[1] References to the Transcript provided by the court reporter will be abbreviated as "Tr." with the corresponding page number.

a third time. The clerk asked again, "Seat 8, is this your independent verdict?"  The juror then answered, "Yes I do."

The unexpected silence, followed by unintelligible mumbling, and then a strange response of "Yes I do," was puzzling, but the process continued for the other jurors.  The juror in seat nine answered yes.  The juror in seat ten answered, "Yes I do," as did the juror in seat eleven.  The juror in seat twelve answered "Yes it is."  The Court decided to question some of the jurors again.  This time, the court clearly indicated that the question "is a yes or no question.  You just need to answer yes or no."  The court then addressed the juror in seat 8.

THE COURT:  "Juror in seat 8, is this your independent verdict, yes or no.  Stand up."

SEAT NUMBER 8:   "Sorry?"

THE COURT: So, is this your independent verdict, yes or no.  You can standup."

SEAT NUMBER 8:  [No response.]

THE COURT:  "My question is a yes or no question.  Is this your independent verdict, yes or no."

SEAT NUMBER 8:   Yes.

Tr. 22.  After polling the remaining jurors, the Court made the following remarks:

All right.  Members of the Jury, let me thank you for your service, I know it is never easy serving as a juror.  We call on you for your time, your patience, your cooperation, and you have given us that and so much more.  And for that I know that the government is appreciative, and I know that the defense is appreciative, and the Court, of course, is appreciative, as is your country and your community.

Now, I know you've sat on this trial, but let me remind you that your service is not yet over as a juror for this court.  It will be soon.  But if you receive a call please answer it, as your service is still needed.  All right, with that let me wish you a pleasant day and thank you very much.

4

Tr. 23. Counsel for Mr. James then made a motion for the juror in seat number eight to be individually questioned to ascertain whether she understood English. Counsel noted, and the Court agreed that she turned to at least one other juror before finally responding in the polling. Counsel also moved for a mistrial even before the Court determined if the juror should be questioned. Tr. 29. The court ultimately agreed to individually question the juror over the government's objection. After doing so, the court was troubled by the juror's limited ability to communicate in English, her apparent problems with remembering significant events that occurred just minutes before being questioned, and her lack of candor to the court. When the Court asked her for her juror number, she responded by giving her name. Tr. 38. When the Court asked if she understands English, she responded, "Yes I do. Okay, I cannot watch too much English for I know I understand everything." Tr. 39. She also provided answers that contradicted what the Court and counsel observed. For instance, she denied turning to any other juror. Tr. 38. The Court asked if she spoke any Spanish while in the jury box, and she answered, "No. No. The sound, I speak in Spanish for everybody speak English." Tr. 39. She also mentioned that there were "two person Spanish in there." Tr. 39. The juror could not answer basic questions about what happened during the polling that occurred minutes earlier. Tr. 41-42. After the conclusion of this questioning, and some discussions with counsel, the Court made the following observations about this juror:

> But as I indicated in chambers, the Court examined the juror in seat number 8 and several things were evident. One, the juror does have problems with the English language. The transcript alone indicates as much. Two, the juror could not recall certain things significantly. She recalled, I believe although it is unclear, inquiries made by the Court of her but not of the courtroom deputy. In fact, when she was asked to recall significantly what happened, the Court pointed out Ms. Brann and said this lady, what happened? She recalls having the number being called, the seat number being called. Not being clear what seat number she was in standing up, and then she said she can't remember anything. And I asked on several occasions, she didn't remember. So, my sense is that

5

> because that juror has an issue with recollection, understanding of
> the English language, and significantly her candor to the Court is
> one development that is clear.

Tr. 54.  The Court was never able to establish that there was a unanimous verdict at that stage.  Mr.

James moved for a mistrial.  That motion was denied.  The Court decided that it would replace the

juror with an alternate juror, over Mr. James' objection.  The Court instructed the newly composed

jury to begin deliberations anew, as if their prior deliberations had never happened.

Eleven of the original twelve jurors were brought back into court about an hour after they

were polled and told to begin their deliberations anew with an alternate.  Less than two hours later,

they informed the court that they reached a verdict which was the same as the one previously

reached – guilty on all three counts.

### III.    Legal Arguments

#### A.  The Court violated Fed. R. Crim. P. 31(d) when it failed to grant a mistrial and substituted an alternate juror after polling.

##### 1.    The plain meaning of the statutory language of Rule 31(d) does not allow juror substitution or for deliberations to begin anew after the jury is polled.

While there were several flaws that related to jury deliberations in this case, the most

flagrant and direct one occurred when the Court violated the Federal Rules by substituting a juror

after polling revealed a lack of unanimity.   A jury verdict in a federal criminal trial must be

unanimous. Fed. R. Crim. P. 31(a); United States v. Scalzitti, 578 F.2d 507, 512 (3d Cir. 1978). A

defendant has the right to poll the jury after it returns its verdict, and if the poll reflects a lack of

unanimity, a district court may direct the jury to redeliberate or may declare a mistrial. Fed. R.

Crim. P. 31(d). Specifically, Rule 31(d) of the Federal Rules of Criminal Procedure provides:

> After a verdict is returned but before the jury is discharged,
> the court must on a party's request, or may on its own, poll the jurors
> individually. If the poll reveals a lack of unanimity, the court may

> direct the jury to deliberate further or may declare a mistrial and
> discharge the jury.

Fed. R. Crim. P. 31(d).  Rule 31(d) does not provide that the court may replace a juror after polling, nor can jury deliberations "begin anew." The rule only allows the court either grant a mistrial or **continue** deliberations with the same twelve jurors.

The option provided in Fed. R. Crim. P. 24(c) that allows the court to replace with an alternate, and begin deliberations anew is completely absent, and contrary to the language and options provided after the jury has been polled.  Rule 31(d) necessarily has to exclusively govern the proceedings after each juror announces their individual verdict and it lack unanimity.  There is simply nothing in Rule 31(d) that allows the court to replace a juror who was incapable of assuring the court that they independently agreed with the verdict.  In this case, there was no way for the court to determine if this juror may have disagreed with the conclusion that the other jurors reached.  Such a situation was obviously contemplated by the Federal Rules, and provides only two options for the court to consider.  Mistrial or *continuation* of the deliberations.  It does not provide that the court can get rid of the juror, put someone else in and start anew.   The court's violation of Rule 31 requires this court to grant Mr. James a new trial.  See Government of the Virgin Islands v. Hercules, 875 F.2d 414, 418 (3d Cir. 1989)(Violation of Rule 31 is *per se* error requiring reversal of defendant's conviction without regard to harmless error analysis.)

> ### 2.   Third Circuit precedent that Rule 31(d) unanimity is "non-waivable" confirms that juror substitution is prohibited after polling.

In United States v. Scalzetti, 578 F.2d 507 (3d Cir. 1978), the Third Circuit established unequivocally that a defendant may not waive his right to a unanimous verdict.  Id. at 513.[2]  In

---

[2] The Third Circuit cited Scalzetti as recently as last year in United States v. Wrensford, 866 F.3d 76, 89 (3d Cir. 2017).

<u>Scalzetti</u>, the jury sent several notes to the district judge during their three days of deliberations, all saying that they were "hopelessly deadlocked because of one holdout juror." <u>Id.</u> at 509. The "holdout" juror anonymously communicated to the judge that he was unable to agree with the other jurors. <u>Id.</u> The trial court held a conference in chambers with counsel for both parties. All counsel for the defense indicated that they would be willing to waive their rights to a unanimous verdict, while counsel for the government objected to anything less than the unanimous verdict of twelve. <u>Id.</u> During the chambers conference, the jury sent out another note requesting the testimony of a certain witness. In response to the request, the district court decided to communicate to the jury that the testimony could be provided to them if that would assist them in reaching a unanimous verdict, or that a verdict of 11 – 1 would also be acceptable. Without communicating further with the court, the jury returned convicting three defendants by verdicts of 11 – 1, and acquitting two others by unanimous verdicts of 12 – 0. <u>Id.</u> at 510.

On appeal, the Third Circuit found that the defendants clearly *attempted* to waive their rights to a unanimous verdict, and that they did so knowingly and intelligently. <u>Id.</u> Nevertheless, the Third Circuit found that the right of unanimity could not be waived. The Court stated:

> Congress has recognized in Fed. R. Crim. P. 31(a) that unanimity is an indispensable feature of federal criminal trials. That rule simply says "(t)he verdict shall be unanimous." It contains no provision allowing waiver of unanimity. Indeed, the history of the formulation of Rule 31(a) reveals that the original version suggested by the Advisory Committee provided for waiver of unanimity, but that original version was met with such criticism that it was withdrawn and the present version substituted. C. Wright, Federal Practice and Procedure s 511 (1969). Rule 31(a) thus stands in contrast to rules such as Fed. R. Crim. P. 23(a) and 23(b), where waiver of their provisions is expressly provided for. We note also that both Rule 31(a) with no waiver provision and Rules 23(a) and (b) with express provisions allowing for waiver were characterized by the Advisory Committee as "restatement(s) of existing law and practice." Notes of Advisory Committee on Federal Rules of Criminal Procedure, Rule 31(a); <u>see id.</u>, Rules 23(a), (b).

8

> This lack of a waiver provision in Rule 31(a) is grounded in part in the strong historical tradition of unanimity in federal trials. It also is grounded, we believe, in the function that the requirement of unanimity has in the jury system. Unlike the "historical accident" of jury size, unanimity relates directly to the deliberative function of the jury. Unanimity serves to effectuate the purpose of the jury system by promoting the full expression of the views of all members of the jury and by insuring that those views are taken into account as fully and fairly as possible in reaching a verdict. See, e.g., Apodaca v. Oregon, 406 U.S. 404, 397-99, 92 S.Ct. 1628 (1972) (Stewart, J., dissenting); id. at 399-403, 92 S.Ct. 1628 (Marshall, J., dissenting). Unanimity is an indispensable element of a federal jury trial because it serves the purpose of insuring that the views of a cross-section of the community are brought to bear fully on the issues to be decided at trial.

Id. at 511- 512.  The Third Circuit explicitly rejected the government's attempt to equate the acceptance of a non-unanimous verdict of 11 – 1 to a defendant waiving his right to proceed with eleven jurors pursuant to Fed. R. Crim. P. 23(b).  In fact, the inclusion of waiver language in Rule 23(b) solidifies the Court's interpretation that the absence of such a waiver provision in 31(d) indicates a clear intent that unanimity could not be waived.

Those findings by the Third Circuit are especially relevant to what happened in Mr. James' case.  First, the Third Circuit observed that a different subsection of Rule 31 provided for the protection of the defendant's right to a jury trial and unanimity.  Second, the Court interpreted the absence of statutory language as prohibiting that which was absent.  In this case, the absence of a waiver prohibits the Court from recognizing a defendant's ability to waive – even when it is knowing and intelligent.  Likewise, the absence of any language in Rule 31(d) regarding juror substitution prohibits it from occurring at that stage of the proceedings.  Finally, when the language in 31(d) is the opposite of what is provided in a different rule, 31(d) should prevail at the post-polling stage of the trial.  Hence where 31(d) only allows the court to *continue* deliberations or grant a mistrial, and another rule mandates that a jury must begin anew, Rule 31(d) must control.

The same conclusion that the Court reached in <u>Scalzetti</u> applies here:  A violation of Rule 31 invalidates the alleged verdict and a new trial must be granted.  <u>See also United States v. Smedes</u>, 760 F.2d 109 (6th Cir. 1985), <u>United States v. Pachay</u>, 711 F.2d 488 (2d Cir. 1983), <u>United States v. Lopez</u>, 581 F.2d 1338 (9th Cir. 1978).

> **3.  Allowing the Court to replace a juror after polling would contravene Rule 31(d)'s underlying purposes.**

With regard to the purpose underlying the polling of juries, the Third Circuit has stated that:

> The object of a jury poll is 'to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been recorded and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented.

<u>Hercules</u>, 875 F.2d at 418 (3d Cir. 1989) quoting <u>United States v. Grosso</u>, 358 F.2d 154, 160 (3d Cir. 1966), rev'd on other grounds, 390 U.S. 62 (1968). (emphasis in original). Likewise, most courts which have examined the rationale underlying Rule 31 agree that the primary purpose of a poll "is to test the uncoerced unanimity of the verdict by requiring 'each juror to answer for himself, thus creating individual responsibility, eliminating any uncertainty as to the verdict announced by the foreman.' " <u>United States v. Shepherd</u>, 576 F.2d at 725 quoting <u>United States v. Mathis</u>, 535 F.2d 1303, 1307 (D.C.Cir.1976) (emphasis in original).  Rule 31 implicitly recognizes the influences which may be exerted on individual jurors to acquiesce in the majority vote. Consequently, the only way to effect the Rule's goal of assuring uncoerced unanimity is to have the jury polled after the return of the verdict but before it is recorded. <u>See</u> <u>United States v. Love</u>, 597 F.2d 81, 84 (6th Cir. 1972).

"The test for validity of the verdict is whether it 'was certain, unqualified and unambiguous considering the circumstances of the receipt of the verdict and poll of the jurors relative to their verdict.' " United States v. Morris, 612 F.2d at 490 quoting Cook v. United States, 379 F.2d 966, 968 (5th Cir.1967); see also United States v. Lee, 532 F.2d 911, 913 (3d Cir.1976) ("[i]n a federal criminal trial, a verdict must be unqualified and unambiguous" and "[i]t must represent the unanimous vote of the jurors").

In this case, the Court agreed that the verdict lacked unanimity but failed to provide a sufficient or legal remedy.  The post polling options do not allow replacement because doing so would defeat the purposes of assuring a fair deliberation among a group of people who may represent a cross section of the community.  If a juror fails to assent to the verdict, the court should not be able to simply bring in another one.  In this case, the court could not clearly determine that the juror independently agreed with the verdict.  While it is true that the option of continuing deliberations with that juror was not feasible, the only other option available was to grant a mistrial. If the court can simply replace a juror who fails to affirm the verdict during polling, then the protections accorded by Rule 31(d) are farcical and easily circumscribed.

### 4. The history of Rule 24(c) shows that juror substitution cannot occur after polling.

The point is further strengthened when Rule 31(d) is viewed in contrast with Fed. R. Crim. Proc. 24.  This is a separate rule that governs the use and discharge of alternate jurors. The history of Rule 24 provides further support for the proposition that it does not apply after the jury is polled. In its prior version, the rule mandated discharge of alternate jurors once the jury retired to deliberate.  Courts were not allowed to replace jurors once deliberations started.  The rule later changed to allow the court to retain alternate jurors "after the jury retires to deliberate."  Fed. R.

Crim. P. 24(c)(3), but there was no amendment to Rule 31(d) to allow replacement after the jury was polled.

The Commentary to the 1999 Amendments to this rule state "As currently written, Rule 24(c) explicitly requires the court to discharge all of the alternate jurors – who have not been selected to replace other jurors – when the jury retires to deliberate.  That requirement is grounded on the concern that after the case has been submitted to the jury, its deliberations must be private and inviolate."  Advisory Committee Notes, 1999 Amendments to Fed. R. Crim. P. 24(c) citing United States v. Houlihan, 92 F.3d 1271, 1285 (1st Cir. 1996), and United States v. Virginia Election Corp., 335 F.2d 868, 872 (4th Cir. 1964).   If the court replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.  Id.

The revised Fed. R. of Crim. P. 24 did not, however, provide the Court with authority to replace a juror *after* the jury was polled.  Further, after Fed. R. of Crim. P. 24 was amended, Fed. R. of Crim. P. 31 was *not* amended to provide a third remedy for the court after polling revealed a lack of unanimity.  Instead, it left intact the limitation that issues arising during polling have only two possible remedies: 1) to deliberate further or; 2) declare a mistrial and discharge the jury.  Fed. R. of Crim. P. 24(d).  This Court's decision to discharge the juror and replace her with an alternate juror was illegal and violated the very rules that are in place to protect the integrity of the jury's deliberations, an essential feature of a jury trial.  The court must grant a new trial.

### 5.  The Third Circuit test for determining coerciveness after polling assumes that jurors would not be replaced.

The Third Circuit's test for determining whether the Court's method for post-polling "redeliberation" was coercive is outlined in the case of United States v. Wrensford, 866 F.3d 76 (3d Cir. 2017).  The test itself provides further support that replacement is not even an option after polling.  In Wrensford, the Third Circuit stated:

We consider several factors to determine whether the method of polling and re-deliberation created an impermissibly coercive environment for the dissenting juror(s). Those factors include: (1) whether counsel objected to continued polling after a juror voiced disagreement with the verdict; (2) whether the trial involves multiple counts and/or multiple defendants; (3) the nature of the court's supplemental instruction, if any; and (4) any evidence showing that the dissenting juror's will may have been overborne. See Fiorilla, 850 F.2d at 176-77; see also United States v. Aimone, 715 F.2d 822, 832 (3d Cir. 1983) (addressing specific challenges to a jury poll).

Wrensford at 90. The first and last factors both assume that the "dissenting juror" remained on the jury for the continuation of deliberations.   The reason the Third Circuit's test assumes that the juror who fails to show assent will remain on the jury is because the rule requires this to be so.

Counsel cannot find a single case where the court replaced a juror after polling. Further, the case law focuses on how the court instructs the jury so that the **dissenting juror** can continue to deliberate in a non-coercive environment. For instance, in Wrensford, one of the reasons the Third Circuit upheld the District Court's instructions to the jury was because the court reminded the jurors that "their verdict must reflect the conscientious judgment of each juror, and said that under no circumstances must any juror yield his conscientious judgment." Id.  In other words, the rule assumes, correctly, that the juror who stood in the way of unanimity would still be on the jury, since the rule does not allow for substitution.  If further deliberations with the same jurors is not feasible, the only other remedy is a mistrial.

In Mr. James' case, the Court correctly found that deliberations could not continue with Juror No. 103.   The Court did not, however, have the option of replacement and to start deliberations anew.  A mistrial is still warranted.

13

**B.  Wayne James was denied his Fifth Amendment right to due process and his Sixth Amendment right to a jury trial.**

It is far beyond the pale of anyone's imagination to think that eleven people could publicly announce their belief that they have found their fellow citizen guilty as charged, and then follow an instruction to act as if they are considering the same questions and trial evidence anew. Both deliberations violated the Federal Rules of Criminal Procedure, the Fifth and Sixth Amendments to the United States Constitution, as well as the bedrock principles associated with the sanctity of jury deliberations.

The right to trial by jury has a rich and sacred history. See generally Duncan v. Louisiana, 391 U.S. 145 (1968). Indeed, "by the time our Constitution was written, jury trial[s] in criminal cases had been in existence in England for several centuries and carried impressive credentials traced by many to [the] Magna Carta." Id. at 151. Thus, the right to a jury trial was one of the most important protections placed in the Constitution. See id. at 149 ("[T]rial by jury in criminal cases is fundamental to the American scheme of justice."); Patton v. United States, 281 U.S. 276, 312 (1930) ("[T]he right of the accused to a trial by a constitutional jury [must] be jealously preserved.").  Two provisions of the Constitution relate specifically to the right to trial by jury. Article III, § 2, cl. 3, provides: "The Trial of all Crimes ... shall be by Jury." U.S. Const. Art. III, § 2, cl. 3. Similarly, the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. Amend. VI.

As recently as last year, the Supreme Court affirmed that:

> The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of

14

> guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law comes from the people.
>
> In the era of our Nation's founding, the right to a jury trial already had existed and evolved for centuries, through and alongside the common law. The jury was considered a fundamental safeguard of individual liberty. . . . The right to a jury trial in criminal cases was part of the Constitution as first drawn, and it was restated in the Sixth Amendment. Art. III, § 2, cl. 3; Amdt. 6.

Pena-Rodriguez v. Colorado, __ U.S. ___; 137 S. Ct. 855, 860 (2017).  That fundamental safeguard that Justice Kennedy referred to above was completely abandoned in Mr. James' trial.

 After Mr. James' first jury was polled, his attorney made a motion to have the court conduct a *voir dire* of Juror No. 8 to determine if she could speak and comprehend the English language.   The court eventually did conduct an individual *voir dire* and was troubled.

When undersigned counsel was asked whether replacing the juror would resolve the issue, counsel responded by stating "absolutely not."  Counsel explained that unanimity was not the only issue.  The jury deliberation process itself was tainted and the court could not reasonably expect the eleven jurors who already reached a decision, were thanked for their service, and told that they were finished, to begin deliberations anew with another juror.  The court disagreed and cited two other cases that occurred recently where the parties learned that a juror could not speak or understand English.  Counsel has since learned that in those cases, the juror was replaced before a verdict was announced.  Consequently, Rule 31(d) did not apply.  Nevertheless, it would appear, based on those experiences, that the Court had a duty to ascertain whether each juror could read, write, and speak English before jurors were seated.  The Court's failure to provide Mr. James with twelve persons who were capable of understanding the evidence and deliberating fairly and impartially deprived him of his constitutional rights.  This was a paper case that involved numerous

documents, records, emails, and testimony that was all in English.  Further, the court's voir dire was conducted in English.  The record does not support a finding that the deliberations with this juror were not tainted.   In fact, the juror's limitations, and her participation in the process invalidated both proposed verdicts.

### C.  The Court committed structural error that requires reversal *per se*.

Even if the Court were to find that Mr. James' assertions and arguments are not of a constitutional dimension, it still should find that error was structural and invalidated any conviction.  In United States v. Curbelo, 343 F.3d 273 (4th Cir. 2003), the Fourth Circuit found that a violation of Fed. R. Crim. P. 23(b) was structural error.  Structural errors affect the very " 'framework within which the trial proceeds, rather than simply ... the trial process itself.' " Curbelo at 281, citing Neder v. United States, 527 U.S. 1, 8 (1999) (quoting Fulminante, 499 U.S. at 310).  It is because such errors " 'infect the entire trial process' " that they require reversal without regard to the evidence in a particular case. Neder, 527 U.S. at 8 (quoting Brecht v. Abrahamson, 507 U.S. 619, 630 (1993)).

In Curbelo, the Fourth Circuit reversed a conviction where the lower court proceeded with eleven jurors in a trial without the defendant's consent.  On appeal, the government conceded that the court committed error but urged the Fourth Circuit to apply a harmless error analysis.  The Court Circuit rejected the government's argument, finding that this was a violation of Fed. R. Crim. P. 23(b), a rule that embodies the accused's Sixth Amendment right.  Curbelo, supra at 281.  Without determining whether the error violated the Constitution itself, the court found that Rule 23(b) "has deep and historical constitutional roots and indisputably represents a strong policy of ensuring criminal defendants in federal court the right to a twelve-person jury." Id. at 283.  The

court remarked that all of its sister circuits had similarly found that a violation of 23(b) require reversal without regard to harmless error.

The same must hold true for the Court's violation of Fed. R. Crim. P. 31(d), as well as the seating of Juror 103 in the first place.  Rule 31(d) similarly seeks to protect the same jury trial rights as 23(b) and the violation here caused a defect in the proceedings that concerned the proper administration of judicial business.  Id.

Of course, this Court is not an appellate court and it has the power to correct errors before we get to the appellate stage.  The circumstances here compel a new trial.

**D. Juror 103's participation in deliberations irreparably tainted the proceedings and the other jurors requiring an entire new panel.**

It was during polling and the subsequent individual questioning of the Juror 103 that the Court learned that she was not capable of fulfilling her requirements as a juror – especially in a case involving numerous documents that were written in English only.  The court learned that her proficiency in speaking and comprehending English was limited.  When the Court asked her for her number, she gave her name.  When the Court asked if she understands English, she responded, "Yes I do.  Okay, I cannot watch too much English for I know I understand everything.  The juror could not answer basic questions about what had happened during the polling.  After the conclusion of this questioning, the Court took issue, not only with the juror's language proficiency, but also with her candor and her ability to recall.  Tr. 54.   The Court's remedy was not a remedy at all, considering the fact that the other eleven jurors reached and announced their decision, and were thanked by the Court for a job well done.  Tr.  23.  While the Court stated several times that it had not discharged or excused the jury after the first polling, its remarks clearly communicated to them that their job for this trial was completed.  The Court stated, "We call on you for your time, your patience, your cooperation, and you have given us that and so much more."  Tr. 23.  The Court

expressed its appreciation for them on behalf of the government and even on behalf of the defense. The Court then said, "I know that you've sat on this trial, but let me remind you that your service is not over yet *as a juror for this court. It will be soon.* But if you receive a call, please answer it, as your service is still need."  The Court then wished them a pleasant day.  Id.  The jurors were left with the impression that their service for this trial was over, but they still could be called for service to the court.

The Sixth Amendment of the United States Constitution guarantees the bedrock principle of trial by an impartial jury. Skilling v. United States, 561 U.S. 358 (2010); see also Murphy v. Florida, 421 U.S. 794, 799 (1975) ("The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.") (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). This guarantee means "a jury that determines guilt on the basis of the judge's instructions and the evidence introduced at trial, as distinct from preconceptions or other extraneous sources of decision." Oswald v. Bertrand, 374 F.3d 475, 477 (7th Cir.2004).  There is no dispute that a conviction must be reversed if a juror, who should have been dismissed for cause, was seated and participated in the deliberations.  United States v. Martinez-Salazar, 528 U.S. 304, 316 (2000).   In this case, there is no dispute that Juror 103 participated in deliberations for many hours with eleven other jurors.  Based on the information the court received as a result of polling, and the subsequent individual *voir dire*, the Court made findings that undermine the legitimacy of her participation in the proceedings. The Court attempted to fix the tainted proceedings by instructing the same eleven jurors to begin their deliberations anew with a substituted juror.  Just as the Court has no means of ascertaining whether Juror 103 was a fair and impartial juror, it has no means of determining how this juror may have tainted the others to vote for conviction, or whether her limitations kept her from convincing the other jurors that there was reasonable doubt

with respect to the government's case.   Due process requires not only "a jury capable and willing to decide the case solely on the evidence before it," but also "a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. 209, 217 (1982).  In this case, the Court failed to examine the taint that this juror's presence may have had on the remaining eleven jurors and the need to empanel an entire new panel at a new trial.

In United States v. Otterburg, 76 F.3d 137 (7th Cir. 1996), the Seventh Circuit determined that it was reversible error to allow two alternate jurors to participate in jury deliberations.  The appellate court found that allowing a verdict that was signed by fourteen jurors to stand would "seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. at 140.  In that case, the trial court gave final instructions to twelve jurors and two alternates.  Id. at 138. Rather than dismissing the two alternates, the court permitted them to retire with the jury to deliberate.  When the jury of fourteen returned its verdict of guilty, it became apparent that the alternates had not signed the verdict forms.  Id. The court then instructed all fourteen to return to the jury room so that the alternates could sign the verdict form.  Id. The jurors left the courtroom momentarily and then returned with fourteen signatures, which included the signatures of the alternates.  The Seventh Circuit found that it was plain error to allow the alternates to participate in the deliberations because it was clear that the "twelve jurors [who] decided the fate of Mr. Ottersburg had substantive communications during their deliberations with persons, the alternates, who were not supposed to participate in those deliberations." Id. at 140.

Just as communications with the alternate jurors tainted the deliberations in Otterburg, communications with Juror No. 103 tainted deliberations in this case.   The Court's proposed

remedy of substitution did not restore Mr. James' constitutional right to due process and a fair and impartial jury.  As the Fourth Circuit stated over fifty years ago,

> The central difficulty with substitution, whether viewed only as a practical problem or a question of constitutional dimensions (procedural due process under the Fifth Amendment or jury trial under the Sixth Amendment), is that there does not appear to be any way to nullify the impact of what has occurred without the participation of the new juror.  Even if it required that the jury "review" with the new juror their prior deliberations or that the jury upon substitution start deliberations anew, it still seems likely that the continuing jurors would be influenced by the earlier deliberations and that the new juror would be somewhat intimidated by the others by virtue of being a newcomer to the deliberations.

United State v. Virginia Election Corp., 335 F.2d 868 (4th Cir. 1964).  "Although Rule 31(d) allows a judge to direct the jury to deliberate further if a poll reveals a lack of unanimity, it does not allow, of course, for directions that are coercive."  United States v. Blitch, 622 F.3d 658, 670 (7th Cir. 2010).  Just as a judge may not instruct a dissenting juror in a coercive way, the court may not simply rid the jury of the juror that stands in the way of unanimity.

The only solution available to the court was to grant a mistrial.  For these reasons we respectfully urge the Court to either grant a new trial pursuant to Fed. R. Crim. P. 33 or to grant Mr. James' request for a mistrial.

WHEREFORE, for the foregoing reasons, we respectfully request that the motion be granted.

Dated:  August 30, 2018

                                        Respectfully submitted,

                                        OMODARE JUPITER
                                        FEDERAL PUBLIC DEFENDER

                                        s/ Omodare Jupiter
                                        OMODARE JUPITER, ESQ.
                                        Asst. Federal Public Defender
                                        1336 Beltjen Road, Suite 202
                                        St. Thomas, VI 00802
                                        Tel: (340) 774-4449
                                        Fax: (340) 776-7683
                                        E-mail:omodare_jupiter@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 30th day of August 2018, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties of record:

**Delia Smith, Esq.**
United State Attorney's Office
5500 Veteran's Drive Suite 260
St Thomas, VI 00802
Tel: 340-774-5757
Fax: 340-776-3474
Email: delia.smith@usdoj.gov

Amanda R. Vaughn
Justin D. Weitz
Trial Attorneys
Public Integrity Section
U.S. Department of Justice
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20005
(202) 616-4530 (office)
(202) 714-4232 (cell)
Amanda.vaughn@usdoj.gov
Justin.Weitz@usdoj.gov

s/ Omodare Jupiter